No. 117,034

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK T. SCHREINER,
*Appellant*,

v.

CHAD S. HODGE and DANNY SMITH,
*Appellees*.

SYLLABUS BY THE COURT

1.

A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved.

2.

Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed, or is about to commit a crime and may demand of the name and address of such suspect and an explanation of such suspect's actions. K.S.A. 22-2402(1).

3.

The decision to stop a person upon a belief of reasonable suspicion is, thus, a discretionary act because it is a decision that is based largely on the officer's training and experience.

1

4.

In extending immunity, our Supreme Court has enacted a policy that police officers should be vested with the necessary discretionary authority to act in a manner which they deem appropriate without the threat of potentially large tort judgments against the city, if not against the officers personally.

Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed November 9, 2017. Affirmed.

*Mark T. Schreiner*, appellant pro se.

*Christopher L. Heigele*, of Coronado Katz LLC, of Kansas City, Missouri, for appellees.

Before HILL, P.J., ATCHESON and SCHROEDER, JJ.

HILL, J.:  In this lawsuit for damages, the plaintiff, Mark Schreiner, complains about the actions of two Mission, Kansas, police officers—one who was investigating a concerned citizen's complaint about a strange truck parked near her home and the second, a supervising sergeant, called to the scene at the plaintiff's request. The district court granted summary judgment to the two officers, essentially ruling the officers had good reason to investigate and the 25-minute encounter was reasonable under the circumstances. The court went on to hold the officers were immune from Schreiner's claims for damages. We agree.

*The facts are undisputed.*

While Schreiner does not dispute the facts, he does challenge the legal conclusions drawn from the facts. In other words, this case boils down to a question of law. See *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

2

*The police receive two phone calls, a month apart, about the same truck.*

In May 2014, the Mission, Kansas, police received a call concerning a suspicious vehicle. The caller told the police that a man had parked his white truck with a Missouri license plate near Broadmoor Street, got out of the truck, and ran into a nearby wooded area. Officer Roy Castle went to that location and found the truck. It was locked. Castle talked to the man who had called. After a brief investigation of the vehicle and after making a quick search of the surrounding area for any signs of break-ins or burglaries in nearby homes, which revealed nothing suspicious, Castle concluded his investigation.

About two weeks later, concerned citizen Mary Cranor, who lives on Broadmoor Street near the location of the first report, called the Mission police. Cranor reported that a suspicious vehicle was parked outside of her home and she saw a man get out and enter the nearby woods. Officer Chad Hodge went to investigate the report. Before reaching the truck's location, Hodge was told about the prior report concerning this truck, including the fact that the individual had left the truck and entered the woods. Hodge's report was included in the documents supporting the joint motion for summary judgment. It narrates what happened.

While Hodge was investigating, Schreiner came out of the woods and walked towards the truck. Hodge met Schreiner on the street before Schreiner got to the truck and asked Schreiner if the truck belonged to him. Schreiner refused to answer. Hodge followed Schreiner and again asked him if the truck belonged to him. Schreiner replied, "Am I under arrest or not?" Schreiner told him that he was not under arrest and he asked Schreiner to stop walking away. Schreiner did not comply and got in the truck. Hodge approached Schreiner and "took control of his left arm" while Schreiner was seated in the driver's seat. Hodge then ordered Schreiner out of the vehicle and told him he was being temporarily detained until Hodge finished his investigation of a report of a suspicious truck.

3

Schreiner complied and got out of his truck but started to walk away. Hodge "took control of his right arm" and again told him that he was not under arrest, but he was not free to leave until Hodge completed his investigation. Schreiner then yelled, "If I'm not free to leave then I'm under arrest." Schreiner, unasked, then stretched out face-down on the street. Hodge told Schreiner to sit on the curb, and he did so. Schreiner gave Hodge his driving license when the officer asked for it. Schreiner asked Hodge to call his supervisor and told Hodge that he would no longer speak to him.

Hodge made the call and Mission Police Sergeant Danny Smith, a supervisor, soon arrived along with some other officers. After their arrival, Hodge checked with the dispatcher to see if the truck was reported stolen and if there were any warrants for Schreiner's arrest. While this was going on, Schreiner gave various reasons to Smith why he had parked his truck at that spot. He told Smith he was having an affair with a woman and they met in a nearby park because he did not want his wife to find out. Schreiner also said he parked under the shady trees and then walked to the Hy-Vee grocery store. Officer Hodge testified that Hy-Vee is located over a half-mile from where Schreiner parked his truck.

The dispatcher told Officer Hodge that there were no warrants for Schreiner and the truck was not stolen. Once the police had this information, they released Schreiner. The entire encounter lasted about 20 to 25 minutes.

Without the benefit of an attorney, Schreiner, in his amended petition, sued Officer Hodge and Sergeant Smith, seeking damages for assault, battery, false arrest, and false imprisonment. The officers moved for summary judgment, arguing that Hodge had reasonable suspicion to stop Schreiner based upon the circumstances and both were entitled to discretionary function immunity under K.S.A. 2016 Supp. 75-6104(e).

4

At the conclusion of its hearing on the motion, the district court noted that Schreiner was evasive, erratic, and nervous with the police. Schreiner does not dispute this finding. The court ruled that reasonable suspicion supported Schreiner's stop and Officer Hodge and Sergeant Smith were entitled to discretionary function immunity under the law. Schreiner appeals, arguing that since there was no evidence of any crime being committed and no evidence that he was involved in any criminal activity, the officers had no right to detain him and the court erred by granting summary judgment.

We are confronted with one legal question to answer. Are the police officers entitled to judgment as a matter of law, as the district court ruled? We begin with an examination of the pertinent statutes and then turn to the cases to establish the framework we must use to reach our decision. As it so frequently does in matters of law, we find our question comes down to a question of reasonableness.

The statute, K.S.A. 2016 Supp. 75-6104(e), describes governmental immunity that arises from discretionary acts:

> "A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
> . . . .
> "(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."

Obviously, Officer Hodge and Sergeant Smith are both employees of Mission, Kansas, and were, at all times pertinent to this lawsuit, engaged in the performance of their official duties. We turn now to the statute dealing with police officers stopping and questioning people.

K.S.A. 22-2402(1) sets out what an officer may do:

> "Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such subject and an explanation of such suspect's actions."

Two points arise from reading this statute. The first phrase, "[w]ithout making an arrest," implies that there is more to the police function in our society than making arrests. This law implicitly recognizes that to do their job, the police must investigate. Obviously, that is what Officer Hodge was doing—investigating a citizen's complaint.

The second point relates to the statute's verb. Clearly, by using the word *may* in the statute, the Legislature leaves the decision to stop a person up to the discretion of the officer. By the language of the statute, the officer is not required to stop a person on the street but *may* do so when the officer reasonably suspects criminal activity is occurring. The decision to stop a person upon a belief of reasonable suspicion is, thus, a discretionary act because it is a decision that is based largely on the officer's training and experience. See *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 234-35, 262 P.3d 336 (2011). Then, in *State v. Walker*, 292 Kan. 1, 8, 251 P.3d 618 (2011), the court clarified that determining whether an officer has reasonable suspicion must be viewed in light of all the circumstances and from the viewpoint of a trained law enforcement officer. So, our inquiry now becomes, were these two police officers performing a discretionary function?  We think so. But to answer the question properly, a review of the pertinent cases is helpful.

We can see that this subject of what is a discretionary function has been the focus of several appellate cases. In analyzing what constitutes a discretionary function, the Kansas Supreme Court instructs that the "nature and quality of the discretion exercised"

6

is the subject of the inquiry. *Robertson v. City of Topeka*, 231 Kan. 358, 362, 644 P.2d 458 (1982). Simply utilizing judgment "is not the hallmark of the exception." *Soto v. City of Bonner Springs*, 291 Kan. 73, 79, 238 P.3d 278 (2010).

"The more a judgment involves the making of policy the more it is of a 'nature and quality' to be recognized as inappropriate for judicial review." *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 365, 819 P.2d 587 (1991). Furthermore, also relevant to the inquiry of whether an action is discretionary is whether the actor must use some expertise, either based on education or experience, in deciding if and how to act. See *Thomas*, 293 Kan. at 234-35; *Allen v. Kansas Dept. of S.R.S.*, 240 Kan. 620, 623, 731 P.2d 314 (1987).

Clearly, we must focus on the actions of police. Because of the nature of police work, the *Robertson* court made it clear that agency guidelines are not much help and announced a statement of policy that we must follow:

> "It would be virtually impossible for police departments to establish specific guidelines designed to anticipate every situation an officer might encounter in the course of his work. Absent such guidelines, *police officers should be vested with the necessary discretionary authority to act in a manner which they deem appropriate without the threat of potentially large tort judgments against the city, if not against the officers personally.*" (Emphasis added.) *Robertson*, 231 Kan. at 362.

The court plainly embraces a policy that police must be allowed to act, in exercising their discretion, free from the threat of civil judgments. This case, and a second, are dramatic examples of the effects of that policy. One deals with police officers' inaction and the second deals with the police making an arrest.

In *Robertson*, the police responded to a call from a homeowner concerning a third party that had no right to be at the house and would likely burn it down if he was allowed

7

to remain. The police refused to remove the third party and told the homeowner to leave the premises. Shortly after the owner left, the house burned. The Kansas Supreme Court held that ordering the owner to leave the property was an exercise of discretion that fell within the discretionary function exception of the Kansas Tort Claims Act. 231 Kan. at 362.

Two years later, in *Mendoza v. Reno County*, 235 Kan. 692, 681 P.2d 676 (1984), discretionary function immunity was applied to a situation involving an arrest for a suspected arson. In this case, the Hutchinson Fire Marshal determined that a house fire was caused by arson. During the arson investigation, an eyewitness told the police that Mendoza was a suspect. The police and fire marshal were told of Mendoza's location and tried to make contact with him in person. Mendoza refused to talk and began walking away. The police arrested Mendoza, and after failing to post bond he spent a night in jail. In the morning, the county attorney determined there was insufficient evidence to convict Mendoza of a crime and released him. Mendoza sued for false arrest, and the district court granted summary judgment due to discretionary function immunity.

On appeal, the Kansas Supreme Court affirmed the district court's finding of discretionary function immunity, holding that the police had probable cause to arrest Mendoza based upon the facts available to them. The decision to arrest Mendoza was a discretionary function for which they were granted immunity. 235 Kan. at 694-95.

With those two Kansas cases for guidance, we turn to the wellspring for all of our law concerning the stopping of individuals by the police, *Terry v. Ohio*, 392 U.S. 1, 5, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Despite its age, the opinion holds lessons for us when we consider the facts of this case. Ordinary actions of individuals can have extraordinary significance to experienced police officers, and investigation of those seemingly ordinary actions can prove to be beneficial to society.

8

In the middle of the afternoon, Officer Martin McFadden's attention was drawn to two men—Chilton and Terry—that were standing on the street corner in Cleveland, Ohio. Officer McFadden began watching the two because of their suspicious movements. One at a time, the men walked down the street, paused, looked into a specific store window, and continued walking down the street. After a short distance, the man walking turned around and walked back towards the starting location, stopping to look in the store window again. The men ended the routine at the corner where they started and conferred with each other. Each man performed this ritual five or six times. At one point when both men were standing on the corner a third man, Katz, approached them and they all briefly conversed. Katz walked away. Chilton and Terry returned to their routine, and after 10 to 12 minutes, they walked off in the direction Katz had gone.

Officer McFadden believed that the men were "'casing a job, a stick-up'" and thought it was his duty to investigate. 392 U.S. at 6. Officer McFadden followed Chilton and Terry and saw them meet with Katz. Officer McFadden approached the three men and identified himself as a police officer. When Terry mumbled some words, Officer McFadden grabbed him, spun him around, and patted down the outside of his clothing. During the pat down Officer McFadden felt a pistol and, after moving the three men into a nearby store, removed the pistol from Terry's possession. A second revolver was found in Chilton's coat.

The United States Supreme Court held that Officer McFadden's action did not violate the Fourth Amendment to the United States Constitution. 392 U.S. at 30-31. The Court did not set out to determine whether Officer McFadden's action in investigating the case was proper. Rather, the crux of the case was whether there was justification for the invasion of Terry's personal security when McFadden searched him. 392 U.S. at 23-24. Although the Court focused upon the search, it briefly commented on Officer McFadden's choice to investigate.

9

When determining if the investigation was proper, the Court weighed the privacy interest of Terry against the government's interest. The government's interest was "effective crime prevention and detection" and "it is this interest which underlies the recognition that a police officer may in appropriate circumstance and in an appropriate manner approach a person for the purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22. The Court recognized that Chilton's, Terry's, and Katz' actions by themselves may have been innocent but taken together warranted further investigation.

> "There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away." 392 U.S. at 22-23.

Based upon the information known to Officer McFadden, the Court stated, "It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." 392 U.S. at 23. In other words, police must be allowed the discretion to investigate, based on the situation that confronts an experienced officer.

We see parallels between the facts of this case with the facts in *Terry*. Schreiner parked his Missouri-registered truck in a residential neighborhood in Mission, Kansas—a neighborhood that Sergeant Smith described as not a thoroughfare. "[I]t's an area that you

10

go into and have to come back out of." In other words, someone would not be simply driving through this neighborhood at random, passing through to some other destination. Schreiner left his truck and entered a wooded area. Sometime later Schreiner returned to his truck.

While parking a vehicle from a different state in a neighborhood is not unusual, leaving the vehicle and entering the woods for a few hours certainly is unusual in this neighborhood and is suspicious. Obviously, two phone calls from citizens are evidence of this. But even though Schreiner's actions are unusual, it does not mean they are criminal. His actions, however, must be considered in light of what the police knew—receiving a call from a concerned citizen, prior reports of peeping toms, burglaries of homes, and burglaries of cars. When the unusual nature of the actions are then considered in the context of what the police knew at the time Schreiner emerged from the woods—much like in *Terry*—it would have been poor police work indeed for Officer Hodge not to investigate what Schreiner was doing when he emerged from the woods.

Once he came out of the trees, every action Schreiner took would arouse the suspicions of a reasonable officer. When asked by the officer if the truck was his, he refused to reply. Getting into the truck without responding to the officer, as if to flee, was also suspicious. Once he got out of the truck, Schreiner walked away again, ignoring the officer. Stopped a second time, Schreiner stretched out face-down in the street even though he was not under arrest and was not asked to do so by the officer. A reasonable officer would ask, why?

All of these actions were questionable to an investigating officer. It was reasonable for Officer Hodge to ask if the truck was his because that was why the officer was there—to investigate a citizen complaint about that specific truck. Was this his truck? What was he doing there? It is quite apparent that these reasonable suspicions arose naturally from the background information the officers had—the location, the

11

citizen complaints, and Schreiner's evasiveness and lack of cooperation. What good officer would not continue his or her investigation under these circumstances?

While it may be debatable whether Schreiner had a right to do what he did, that is, not speaking to the officer and trying to walk away, our task is not to examine Schreiner's actions but the actions of the officers he has sued for damages. This is not a criminal prosecution where we have to decide the admissibility of evidence. Rather, this is a lawsuit for damages. This brief detention would have been shorter but for Schreiner's actions. What the officers did was done largely in response to what Schreiner did. Clearly, there were legitimate reasons for the steps the officers took.

Upon further reflection, we note that had the facts been a bit different and Schreiner had been driving his truck and Officer Hodge had stopped him for a traffic infraction, a brief detention while a computer check was completed would be acceptable. After all, computer record checks are standard police procedures today and usually do not take too long.

The Kansas Supreme Court has held that during a routine traffic stop an officer may request the driver's license and car registration, conduct a computer check, and issue a citation. However, if at the time these checks are finished the officer does not have information that raises a reasonable and articulable suspicion of illegal activity, the driver must be allowed to leave. *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007).

But especially pertinent here is the analogous case of *State v. Reason*, 263 Kan. 405, 951 P.2d 538 (1997), *abrogated on other grounds by State v. Berreth*, 294 Kan. 98, 273 P.3d 752 (2012). In *Reason*, the police spotted a vehicle in a parking lot with both doors open and two people inside, either asleep or unconscious. The police woke them up and asked for their identification and vehicle registration information. After Reason did not provide the requested information, the police checked on the VIN. Our Supreme

12

Court held that while the investigation began as a voluntary encounter, it became more of an investigatory detention because of the VIN check. The court held that the scope and duration of the investigation were proper because Reason's refusal to provide identification and vehicle registration provided justification to investigate his claim of vehicle ownership. 263 Kan. at 412-13. Similarly, here, Schreiner's refusal to answer when Hodge asked if the truck was his certainly provided the officer with justification to investigate.

Additionally, we note that Schreiner was never arrested, or handcuffed, nor was he frisked by Officer Hodge. From this record, it is clear that no voices were raised toward Schreiner and no foul language or epithets of any kind were directed toward him by any officer. While wanton conduct of a government employee is not covered by discretionary function immunity, there is simply no evidence that Officer Hodge (or Sergeant Smith) acted wantonly in this case. See *Soto*, 291 Kan. at 81-82. To the contrary, this record shows that both officers acted with professional restraint.

To summarize, Officer Hodge is entitled to discretionary function immunity because he detained Schreiner for a few minutes to conduct an investigation upon a reasonable belief that criminal activity was occurring. In his deposition testimony, he stated his thoughts concerning the suspicious vehicle and his reason for the investigatory detention as follows:

> "Initial thoughts upon arrival were why do I have a vehicle parked in a residential area and the driver did not enter a residence. He entered the woods instead of a residence. To me in my mind, what's running through my mind is where [is] this person at, is he over in the apartment complex committing vehicle burglaries, is he walking around in the neighborhood looking in windows, is he up at the businesses just to the south trying to steal a car, trying to commit burglaries. Same things go with the apartment complex just to the west. That's what was running through my head."

13

In light of the holdings in *Mendoza* and *Robertson*, we find it logical to hold that an officer's decision to temporarily detain a suspect for an investigatory detention based upon reasonable suspicion is a discretionary function. Under the analysis of *Robertson*, 231 Kan. at 362, the police officers on the street should be vested with the discretion to detain persons when the officer has a reasonable belief that criminal activity is afoot. Under these facts, Officer Hodge is entitled to act within his discretion to make the stop without the fear of a tort judgment—meaning, he is entitled to discretionary-function immunity.

The rule on summary judgment is fixed and clear. Summary judgment is appropriate when the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue about to any material fact and that the moving party is entitled to judgment as a matter of law. *Drouhard-Nordhus v. Rosenquist,* 301 Kan. 618, 622, 345 P.3d 281 (2015). Officer Hodge was entitled to summary judgment due to his immunity.

We turn to the claims against Sergeant Smith. Schreiner is not entirely clear what tortious conduct Smith allegedly committed. It appears that he is alleging that Officer Smith committed false imprisonment by not releasing him when he first arrived at the scene. We will address that in a moment.

But first, we must observe that the claim of battery cannot prevail because Smith never touched him. Likewise, we do not see how a claim for false arrest can be valid because Sergeant Smith never arrested Schreiner. The facts indicate that Smith simply came to the scene at Schreiner's request, talked to him, and listened to Schreiner's conflicting reasons for being at the scene.

If Schreiner is indeed complaining about Smith not releasing him when he arrived, in our view, the decision not to release Schreiner was an immune discretionary act. In

14

*Soto*, 291 Kan. at 88, our Supreme Court upheld the grant of discretionary function immunity to an officer who did not immediately investigate a claim of mistaken identity of a suspect arrested under a warrant. Similarly here, Smith's decision to continue Schreiner's investigatory detention until the computer information could be obtained from the dispatcher is reasonable. Therefore, Smith is entitled to discretionary function immunity. Because he is immune, Smith, too, was entitled to summary judgment. Thus, we answer our initial question in the affirmative. Both police officers are entitled to judgment as a matter of law.

The dissent places the Mission police officers on trial and finds them guilty of "an obvious violation" of the Fourth Amendment to the United States Constitution. Slip op. at 28. We thought our purpose in this appeal was to determine if the district court erred in granting summary judgment.

We do not agree that this is a disturbing diminution of the Fourth Amendment to the United States Constitution. We thought this was simply an occasion where the police, while investigating a citizen complaint, briefly detained a man and then let him go.

We do not dispute that tortious conduct that is the result of a detention completely devoid of any reasonable indication of criminal activity would not be protected by discretionary function immunity. But we do disagree that Officer Hodge did not act reasonably in the execution of his investigation. Officer Hodge had sufficient justification, grounded by the reality of the facts known to him at the time of the detention, to continue the investigation to the point that a judicial determination that reasonable suspicion was not present only shows an abuse of discretion.

The language the Legislature used in creating discretionary function immunity necessarily permits the immunity to be applied "whether or not the discretion is abused and regardless of the level of discretion involved." See K.S.A. 2016 Supp. 75-6104(e). In

15

other words, discretionary function immunity protects government employees even if they make an incorrect choice in applying their discretion. If the dissent is correct and Officer Hodge abused his discretion by making a stop on a reasonable, but ultimately incorrect, belief that he had good reason to detain Schreiner, the statute still provides him immunity.

If we follow the dissent's view, Officer Hodge had to make the correct determination of whether to detain Schreiner within the short period of time between when Schreiner came out of the woods and when Officer Hodge grabbed his arm. In other words, by making an incorrect determination of whether reasonable suspicion supports Schreiner's detention, Officer Hodge is now open to a potentially large tort judgment. This conclusion reaches the opposite result of the purpose of discretionary function immunity as applied to police functions established by the court in *Robertson*.

As we said earlier, in *Robertson*, the court held that "police officers should be vested with the necessary discretionary authority to act *in a manner which they deem appropriate* without the threat of potentially large tort judgments against the city, if not against the officers personally." (Emphasis added.) 231 Kan. at 362. A police officer must be vested with the ability to reach a decision to detain a suspect on a reasonable belief that reasonable suspicion exists without the fear of a potentially large tort judgment, even if that determination is ultimately incorrect.

Implicit in the dissent's view is that Officer Hodge, when faced with someone refusing to answer his questions while he is investigating, should throw up his hands and withdraw from the field, thinking, "I may be sued if I investigate further." In other words, officer, abandon your investigation of a citizen complaint. Citizen complaints are not trivial. It certainly was not to Officer Hodge, nor to the lady who lived there, nor to us.

Affirmed.

ATCHESON, J., concurring in part and dissenting in part:  Based on the evidentiary record in front of the Johnson County District Court on summary judgment in this civil action, City of Mission police officers stopped and detained Plaintiff Mark Schreiner without any lawful reason. The evidence, therefore, supports claims they violated Schreiner's clearly established constitutional rights and, while doing so, committed the torts of battery and false imprisonment. On the way to entering judgment for the officers, the district court misconstrued controlling constitutional principles and misapplied the Kansas Tort Claims Act to shield government actors who engage in conduct obviously violating a citizen's fundamental rights. On appeal, the majority aids and abets that mistaken decision and its disturbing diminution of the Fourth Amendment to the United State Constitution as a protection against governmental intrusions on conduct as ordinary as walking down the street to one's car. I respectfully dissent from the legal analysis leading to that result. I would reverse and remand to the district court for further proceedings, presumably including a jury trial, on some of Schreiner's claims. Several of his claims are simply without factual support, and I concur in their dismissal for that reason alone.

The contours of this case are somewhat ill-defined at least in part because Schreiner, a nonlawyer, has represented himself throughout and the facts in the summary judgment record are something less than comprehensive. Some of the majority's analysis also tends to obscure what's really going on and what's really at issue. The majority focuses on statutory immunity, although the officers also argue common-law privilege on appeal and the district court relied on both defenses.

## I. OVERVIEW, STANDARD OF REVIEW, AND FACTUAL BACKGROUND

Schreiner sued Mission Police Officer Chad Hodge and Sgt. Danny Smith for civil assault, battery, false arrest, and false imprisonment, all of which are intentional torts. We are reviewing the district court's decision granting summary judgment to those officers on each of those claims. That procedural posture shapes how we must view the factual record presented to the district court.

As I discuss in more detail, Hodge accosted Schreiner on a residential street in Mission. The case really pivots on whether that initial contact was an investigatory detention based on reasonable suspicion or a voluntary encounter within the meaning of the Fourth Amendment. During their interaction, Hodge grabbed Schreiner by the arm two different times. Schreiner was detained for about 25 minutes by several officers, including Hodge and Smith. Hodge and Smith argued that the physical contact with and detention of Schreiner was privileged or lawful because they had a reasonable suspicion he had been engaged in criminal conduct and, therefore, could hold him at least briefly to investigate that suspicion. The officers also argued that their decision to hold Schreiner and the manner by which they held him entailed a "discretionary function" immunized under the Kansas Tort Claims Act (KTCA), K.S.A. 2016 Supp. 75-6104(e). If, however, the encounter was voluntary, Schreiner had a constitutional right to disregard Hodge's inquiries and go about his business without interference—meaning the officers had no privilege to lay hands on him or otherwise detain him. And the KTCA does not shield plainly unlawful conduct as an exercise of discretion. The summary judgment record fails to support the legal arguments Hodge and Smith advance, so the district court erred in ruling in their favor on those grounds. The majority errs in perpetuating that misconstruction of Fourth Amendment law and the KTCA.

In short, the limited summary judgment record, consisting of deposition excerpts and various documents, fails to establish the legal defenses Hodge and Smith have

18

presented. Schreiner, therefore, should get a day (or two) in district court so a jury can see and hear the witnesses testify and review all of the other relevant evidence to determine what actually happened and whether what happened amounted to actionable civil wrongs. Contrary to the majority's implication, I make neither a recommendation nor a prognostication as to what a jury ought to conclude after a full airing of the circumstances.

As the parties seeking summary judgment, Hodge and Smith have the obligation to show, based on appropriate evidentiary materials, there are no disputed issues of material fact and judgment, therefore, could be entered in their favor as a matter of law. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, Syl. ¶ 2, 308 P.3d 1238 (2013); *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In addressing a request for summary judgment, the district court must view the evidence most favorably to the party opposing the motion, here Schreiner, and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Thoroughbred Assocs.*, 297 Kan. 1193, Syl. ¶ 2; *Shamberg*, 289 Kan. at 900. An appellate court applies the same standards in reviewing the entry of a summary judgment. *Thoroughbred Assocs.*, 297 Kan. 1193, Syl. ¶ 2.

In addition, to the extent Hodge and Smith have relied on privilege and discretionary function immunity under the KTCA, those are defenses on which they would bear the burden of proof at trial. See *Soto v. City of Bonner Springs*, 291 Kan. 73, 78, 238 P.3d 278 (2010) (KTCA immunity); *Jackson v. U.S.D. 259*, 268 Kan. 319, Syl. ¶ 3, 995 P.2d 844 (2000) (KTCA immunity); *Redding v. Shelton's Harley Davidson, Inc.*, 139 N.C. App. 816, 821, 534 S.E.2d 656 (2000) (privilege presents affirmative defense to civil battery on which defendant bears burden of proof); Prosser and Keeton on the Law of Torts § 16 (5th ed. 1984) (defendant must "plead and prove" privilege or justification excusing conduct otherwise amounting to intentional tort); 6A C.J.S., Assault § 49

19

(defendant bears burden of proving privilege or justification as affirmative defense to battery). Parties seeking summary judgment on a legal point they must prove have to present uncontroverted facts establishing that point to prevail. *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 497, 276 P.3d 773 (2012).

Basically, the factual record shows that on a weekday afternoon in early June 2014 Schreiner lawfully parked his pickup truck on a residential street in Mission near where he worked. He then walked to what has been described as "woods," which I take to be a municipal park or similar government property open to the public. Nothing in the record indicates the "woods" to be private property or restricted in some way making entry a trespass or otherwise unlawful. A resident on that block called the Mission police to report the truck as suspicious. Hodge was dispatched to investigate the vehicle. The record evidence does not indicate what the resident said or how she characterized the situation. As far as we know, Hodge had no factual information about why the truck actually might be considered suspicious.

The dispatcher informed Hodge that a citizen complaint had been received about two weeks earlier regarding the same truck being parked on the same block. That complaint indicated the driver had left the truck and gone into the woods. In support of their motion for summary judgment, Hodge and Smith submitted deposition excerpts from the officer responding to that complaint. He testified that he located the truck, ran a computer check of the license plate, found nothing amiss with the vehicle or any nearby residences, and could not find the driver. The officer recorded that information in his official activity log. In short, all the officer turned up was a truck parked on the street.

Hodge testified he was aware there had been vehicular and residential burglaries "in the area" and reports of possible peeping Toms. But the record does not include any information about the number of such crimes, when they happened, or how large an area Hodge was referring to. Quite apparently, however, Hodge was not talking about

20

immediate incidents. When Hodge arrived, he saw the truck lawfully parked on the street and quickly determined it had not been broken into. Nor did he see anything in the truck that might be considered contraband or evidence of a crime. Hodge was in the process of relaying the vehicle identification number to the dispatcher when Schreiner came from the woods toward the truck. Hodge approached Schreiner and began to ask him about the truck. According to Hodge, Schreiner essentially ignored him and walked to the truck. Schreiner asked if he was under arrest. Hodge told him he was not. Schreiner then got in the truck at which point Hodge grabbed his arm and told him he was not free to leave. Hodge recounted that Schreiner then got out of the truck and began to walk away. So Hodge grabbed his arm a second time and told him to stop. At Hodge's request, Schreiner handed over his driver's license but generally refused to answer any questions. Hodge, at Schreiner's request, called for a supervisor—who turned out to be Smith. Several other officers showed up with Smith.

The officers kept Schreiner at the scene for roughly 25 minutes and then informed him he could go. During that time, the officers ran computer checks on the truck and Schreiner, neither of which turned up anything noteworthy or suspicious. Schreiner was never formally arrested in the sense any of the officers told him he was under arrest or handcuffed him. No charges were filed against Schreiner.

## II. FOURTH AMENDMENT PRINCIPLES UNDERCUT DEFENSE OF PRIVILEGE

As I have indicated, the key issue here is how the Fourth Amendment's prohibition on unreasonable government searches and seizures applies to those circumstances. If the seizure of Schreiner was plainly unreasonable under the Fourth Amendment, then the otherwise tortious conduct of Hodge and Smith cannot be privileged or excused and the KTCA's discretionary function immunity does not shield them. I now turn to settled principles of Fourth Amendment law.

For Fourth Amendment purposes, the courts have identified four general categories or types of interaction between law enforcement officers and citizens: voluntary encounters; investigatory or *Terry* stops; arrests; and public safety contacts. See *State v. Cleverly*, 305 Kan. 598, Syl. ¶ 4, 385 P.3d 512 (2016). Everyone agrees (at least tacitly) this case does not involve an arrest or a public safety contact.

As the phrase suggests, a voluntary encounter entails a law enforcement officer approaching a person and initiating a conversation with the individual absent any legal grounds to detain him or her or to otherwise compel any cooperation. Accordingly, the individual freely may choose to stay and respond or may simply walk away. See *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *State v. McKeown*, 249 Kan. 506, 509-10, 819 P.2d 644 (1991). The parameters of the interaction are legally no different from two private citizens meeting by chance in a public place—either may disregard the other at no more than the cost of appearing rude. See *City of Topeka v. Grabauskas*, 33 Kan. App. 2d 210, 219, 99 P.3d 1125 (2004) (hallmark of Fourth Amendment voluntary encounter is right of citizen to refuse to answer questions and to leave). Concomitantly, a law enforcement officer rebuffed during a voluntary encounter *cannot* treat the citizen's lack of cooperation as an indicator of criminality warranting an investigatory stop or some other involuntary detention. *McKeown*, 249 Kan. at 509-10; *Grabauskas*, 33 Kan. App. 2d at 219; see also *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion) (citizen's "refusal to listen or answer" during a voluntary encounter does not "furnish those grounds" justifying a constitutionally permissible seizure or detention). If the law were otherwise, the encounter couldn't be truly voluntary, since the citizen participant would incur a legal detriment for choosing to disengage.

In an investigatory detention or *Terry* stop, as Hodge and Smith claim here, law enforcement officers may halt and briefly question a person if they have a reasonable suspicion based on articulable facts that the individual has just committed, is committing,

22

or may be about to commit a crime. See *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 21-23, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The suspicion of criminal involvement cannot rest on mere hunches or speculation, but an officer may rely on training and experience to deduce nefarious implications from the circumstances that those outside the law enforcement field might view as entirely innocuous. See *Terry*, 392 U.S. at 22-23, 27; *State v. Martinez*, 296 Kan. 482, Syl. ¶ 4, 293 P.3d 718 (2013) (district court erred in finding that an experienced officer with a hunch possessed a reasonable suspicion of wrongdoing); accord *Brown v. Texas*, 443 U.S. 47, 52 n.2, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). Reasonable suspicion doesn't conform to a concise definition or a precise quantification, but it is less demanding than probable cause and far less so than a preponderance of the evidence. To be reasonable, however, the suspicion must be supported by at least some objective facts indicating criminal involvement on the part of the person stopped. *State v. Jones*, 47 Kan. App. 2d 866, 872, 280 P.3d 824 (2012), *aff'd* 300 Kan. 630, 333 P.3d 886 (2014). Law enforcement officers may use reasonable force, if necessary, to carry out an investigatory detention. See *State v. Hill*, 281 Kan. 136, 142, 130 P.3d 1 (2006) (officer's use of handcuffs does not automatically convert *Terry* stop into an arrest requiring probable cause).

Here, even looking at the summary judgment evidence favorably to Hodge and Smith (just the reverse of the proper standard), we have a truck with Missouri license plates lawfully parked on a residential street in the middle of the day. But the truck provided no indication of criminal activity, such as contraband in plain view or broken windows or other unusual damage. Nothing in the citizen complaint suggested otherwise. We have Schreiner walking toward the truck from the wooded area. He smelled of neither alcohol nor marijuana. He wasn't staggering or otherwise unsteady. So he didn't appear to be under the influence. He didn't have work gloves and a screwdriver in his pocket (possible burglar's tools), and he wasn't carrying an unboxed big-screen television

23

(possible burglar's loot). Hodge had no reports of any fresh criminal activity in the vicinity, only some general knowledge that there had been burglaries "in the area" in the past—an unremarkable circumstance likely typical of most urban or suburban "areas."

I discern no facts in that scenario that would be suspicious for Fourth Amendment purposes. The circumstances are devoid of anything from which to fashion a reasoned inference of past, present, or future criminality on Schreiner's part. The previous report concerning the truck doesn't do so, since it turned up nothing. Hodge didn't really even have an articulable fact-driven hunch that Schreiner might be a criminal. He arrived with fantasyland speculation he mentally ran through as he drove to the location of the truck. See *Terry*, 392 U.S. at 27 (officer must act on "specific reasonable inferences . . . draw[n] from the facts" and not on "inchoate and unparticularized suspicion"). That's not enough for an investigatory stop of a person walking on a residential street in the middle of the day. See *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."); *State v. Anguiano*, 37 Kan. App. 2d 202, 207, 151 P.3d 857 (2007) (same); cf. *State v. Walker*, 292 Kan. 1, 11-12, 251 P.3d 618 (2011) (officer had reasonable suspicion to stop individual matching general description of suspect in burglary that had occurred five minutes earlier about two blocks away); *State v. McGonigle*, No. 108,077, 2013 WL 3970187, at *1-2 (Kan. App. 2013) (unpublished opinion) (officer lacked reasonable suspicion to stop pickup truck traveling within the speed limit on major road simply because it was only vehicle in sight during early morning hours immediately after report of burglar alarm at business on nearby side street).

By finding reasonable suspicion for a *Terry* stop in this case, the majority necessarily endorses the proposition that a law enforcement officer can detain and question an individual because he or she is walking up to a motor vehicle parked in a residential neighborhood if the vehicle does not appear to belong to a resident and there

have been past property crimes in the general area. That is a perilous degradation of the Fourth Amendment's protections against imperious government intrusion upon a citizen's privacy.

The majority avers this case has much in common with the investigatory stop the Supreme Court approved in *Terry*. But that's mistaken. In *Terry*, a veteran detective watched two men over about a 10-minute span as each walked back and forth in front of a business half a dozen times and peered in as he passed. They conferred between their trips and briefly spoke with a third man, who they then followed down the street. While that activity was not itself unlawful, it would have been unusual by any account. To the detective, however, it was criminally suspicious, for, as he later explained, the men appeared to be casing the business preparatory to a robbery. He stopped all three men after they had regrouped down the street, questioned them, and then searched them. Two of the men illegally had handguns for which they were prosecuted. The detective relied on the coordinated and out-of-the-ordinary conduct of three men that to an experienced law enforcement officer potentially signaled a criminal plot afoot. The conclusion— derived directly and solely from the men's own actions—amounted to a reasonable suspicion of an incipient armed robbery. *Terry*, 392 U.S. at 23.

Here, Hodge saw Schreiner walk to his pickup that had been parked on a residential street. Hodge reasonably could have inferred Schreiner didn't live in the neighborhood. But Schreiner did not behave in an unusual manner, let alone a sinister one as Hodge interdicted him. Past burglaries in the area having no discernable association with suspects or vehicles resembling Schreiner or his truck furnished no reasoned basis to transform the circumstances into a constitutionally permissible investigatory stop. In short, Hodge lacked "specific reasonable inferences" of potential criminal activity drawn "from the facts," as required by *Terry*, 392 U.S. at 27, and settled Fourth Amendment law built upon that decision. The interaction between Hodge and Schreiner, therefore, was a voluntary encounter rather than an investigatory detention. In turn, Schreiner had every

25

right to ignore Hodge's inquiries and walk away. And Hodge had no authority to physically restrain Schreiner or to otherwise inhibit his exercise of that right. Schreiner's continued refusal to answer questions or to be particularly compliant didn't furnish independent grounds for the officers to conclude they had nabbed a criminal. So their continued detention of Schreiner lacked constitutional justification.

Perhaps even more to the point in this civil action, a reasonably trained law enforcement officer ought to understand the difference between fact-based inferences that would support an investigatory detention and unmoored speculation that wouldn't, especially half a century after *Terry*. For summary judgment purposes, Hodge cannot lay claim to an effective defense of privilege or justification for his conduct in grabbing Schreiner and participating in his detention for 25 minutes. Likewise, on the summary judgment record, once Smith arrived and assessed the situation, he should have realized Hodge had no lawful basis for stopping Schreiner in the first place and Schreiner's continued detention was wrongful. Smith, then, has not demonstrated sufficient uncontroverted facts to establish a privilege for any otherwise tortious conduct properly attributable to him.

### III. INTERLUDE FOR A PARTIAL CONCURRENCE

That legal conclusion brings me to an interlude to explain my partial concurrence. The uncontroverted facts presented in the summary judgment papers, viewed to Schreiner's best advantage (as they must be), fail to establish the elements of a civil assault, so the district court correctly ruled against Schreiner and for Hodge and Smith on that claim even without regard to privilege or KTCA immunity. See *Baska v. Scherzer*, 283 Kan. 750, 756, 156 P.3d 617 (2007) (civil assault entails threat of bodily harm coupled with apparent ability to carry out threat resulting in victim's immediate apprehension of harm). The evidence similarly fails to show conduct on Smith's part amounting to a battery of Schreiner. 283 Kan. at 756 (civil battery entails unprivileged

intentional touching with purpose of bringing about harmful or offensive contact). The district court properly entered judgment for Smith on that claim. Finally, the facts don't support a false arrest claim distinct from the false imprisonment claim, and Schreiner would not be entitled to recover on both claims. On that basis, the false arrest claim doesn't survive summary judgment, since Schreiner ought to be allowed to go forward on the false imprisonment claim. See *Brown v. State*, 261 Kan. 6, 9, 927 P.2d 938 (1996) (Kansas courts use terms "'false arrest'" and "'false imprisonment'" to refer to intentional tort in which one person physically restrains another person's liberty without lawful justification). To that extent, I concur with the result the majority reaches in affirming the district court, although I do so for different reasons.

## IV. DISCRETIONARY FUNCTION IMMUNITY DOES NOT PROTECT PATENT FOURTH AMENDMENT VIOLATIONS

Apart from privilege—a common-law defense to Schreiner's tort claims—Hodge and Smith invoked discretionary function immunity under the KTCA to shield their actions. K.S.A. 75-6104(e). Both the district court and the majority have incorrectly extended that defense to the officers. Where, as here, the evidence shows government agents have chosen a course of conduct that violates clearly established law, the immunity does not apply. A deliberate choice to act in a plainly unlawful way cannot be the sort of decision-making protected by discretionary function immunity. *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 322, 757 P.2d 272 (1988) ("The governmental agency cannot properly claim that its challenged action falls within the discretionary function exception where the action taken violated a legal duty."). Here, the summary judgment record shows a clear violation of Schreiner's rights protected in the Fourth Amendment. Government agents have a legal duty owed individuals with whom they interact to conform their conduct to those constitutional rights and may be held to answer for conduct violating that duty.

27

Under the KTCA, municipal liability is the rule and immunity the exception. *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 233, 262 P.3d 336 (2011); see K.S.A. 2016 Supp. 75-6103. As a general proposition, the KTCA immunities are to be narrowly construed, since they curtail the rule of liability. *Jackson v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984); *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 290, 261 P.3d 943 (2011). The appellate courts have, nonetheless, given a particularly broad sweep to discretionary function immunity to insulate decisions law enforcement officers make in the field when responding to specific incidents. See, e.g., *Woodruff v. City of Ottawa*, 263 Kan. 557, 566-67, 951 P.2d 953 (1997). But the immunity has an outer limit—the choice or decision must be one made among reasonable alternatives, and the chosen course of conduct must itself be reasonable. See *Thomas*, 293 Kan. at 236 (discretionary function immunity covers choice among options all of which conform to general duty of care); *Estate of Belden*, 46 Kan. App. 2d at 292 (For discretionary function immunity to apply, "the decision must reflect . . . a course of conduct grounded in legitimate options requiring an exercise of reasonable judgment to select one option over the others.").

Here, the facts for summary judgment purposes show Hodge physically restrained Schreiner by grabbing him twice and detaining him for a measurable time without reasonable suspicion or any other lawful justification. Hodge's conduct entailed an obvious violation of Schreiner's Fourth Amendment right to be free from unreasonable government seizure. Choosing to act in derogation of a citizen's established constitutional rights rather than acting (or refraining from acting) in a way that preserves those rights cannot be an objectively reasonable decision. And, in turn, that decision cannot be protected under the KTCA's discretionary function immunity. The protection does not extend to and shield a choice that is itself plainly unlawful. Particularly as a law enforcement officer, Hodge should have known his conduct fell outside the Fourth Amendment, so a subjective belief on his part to the contrary makes no difference. Given the summary judgment evidence, we are not confronted with a case in which reasonable

28

suspicion was a close or debatable call. How discretionary function immunity would apply in that case presents a different question—one I do not presume to answer. On the summary judgment record, Hodge cannot defeat Schreiner's claims for battery and false imprisonment based on a claim of immunity under K.S.A. 2016 Supp. 75-6104(e).

For the same reasons, the false imprisonment claim against Smith should go forward. So far as the summary judgment record indicates, Smith was accurately informed of the situation when he arrived at the scene. Smith has not claimed he was misinformed about the circumstances in a way that reasonably would have led him to conclude that Schreiner's constitutional rights had not been violated. Smith, therefore, knew or should have known Hodge had no lawful basis to stop Schreiner in the first place or to detain him. Accordingly, Smith's decision to prolong the detention simply continued the violation of Schreiner's constitutional rights and can't be shielded as a discretionary function immunized under K.S.A. 2016 Supp. 75-6104(e).

The majority goes through several exercises to support its affirmance of summary judgment for Hodge and Smith. But they are unavailing because they don't take account of the violation of Schreiner's Fourth Amendment rights at the core of his tort claims. The majority cites K.S.A. 22-2402(1) that codifies the constitutional rule laid down in *Terry*. The statute permits (but does not require) a law enforcement officer to make an investigatory stop of a person based on reasonable suspicion. In that circumstance, the statute authorizes officers to do so but does not mandate they do so. That flexibility might well trigger discretionary function immunity under the KTCA when an officer armed with reasonable suspicion chooses between initiating an investigatory detention and not. But K.S.A. 22-2402(1) does not authorize an officer *without* reasonable suspicion to make a *Terry* stop. The statute, therefore, has no application here.

Similarly, *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982), and *Mendoza v. Reno County*, 235 Kan. 692, 681 P.2d 676 (1984), are inapposite. In

29

*Robertson*, the court recognized that law enforcement officers exercised a discretionary function in how they provided police services in performance of their "duty. . . to preserve the peace" and, therefore, upheld the dismissal of Robertson's tort claim for damages. But the court also held that duty accrued to the general public and afforded no cause of action to an individual for an arguable breach. 231 Kan. at 363-64. Here, Schreiner has not based his tort claims on a violation of that duty but on a constitutional duty to refrain from unreasonable searches and seizures. And the summary judgment record supports a clear violation of the constitutional duty. The *Mendoza* decision stands for the unremarkable proposition that law enforcement officers making a warrantless arrest based on evidence undisputedly establishing probable cause have immunity under the KTCA in a civil action for false arrest. 235 Kan. 692, Syl. ¶ 1. The county attorney reviewed the potential criminal case against Mendoza and exercised his discretion not to prosecute because he believed the evidence would not convince a jury beyond a reasonable doubt to convict. Mendoza was released after spending the night in jail. The county attorney's decision, however, did not negate the actual evidence that furnished probable cause and supported the officers' determination to arrest Mendoza, thereby bringing their decision within the KTCA discretionary function immunity. 235 Kan. at 694. If Hodge actually had a reasonable suspicion justifying Schreiner's detention, *Mendoza* would be compelling analogous authority for discretionary function immunity in this case. But Hodge didn't, meaning *Mendoza* isn't.

I would reverse and remand Schreiner's claims for battery and false imprisonment against Hodge and false imprisonment against Smith for further proceedings. The summary judgment evidence does not support the defenses of privilege and discretionary function immunity to those claims in the face of a clear violation of Schreiner's constitutional rights.